423 So.2d 1103 (1982)
STATE of Louisiana
v.
William PERKINS.
No. 81-KA-3120.
Supreme Court of Louisiana.
November 29, 1982.
*1104 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Louise Korns, David Plavnicky, Asst. Dist. Attys., for plaintiff-appellee.
*1105 Clyde D. Merritt, Dwight Doskey, Orleans Indigent Defender, New Orleans, for defendant-appellant.
DIXON, Chief Justice.[*]
Defendant William Perkins was indicted by a grand jury for first degree murder in violation of R.S. 14:30.[1] After being tried by a jury of twelve persons and found guilty, he was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence, pursuant to the jury's recommendation. C.Cr.P. 905.6. Defendant appeals and asserts four assignments of error for the reversal of his conviction and sentence.
On the morning of April 9, 1979 defendant and his girl friend, Cynthia Whitney, were having an argument on Washington Avenue as the defendant was attempting to get her to take their baby home. Defendant grabbed her by the shoulder and squeezed her until she fell to the ground. At this time David Cage, the victim, who was driving by in his tow truck, stopped to intervene. As he approached the defendant and his girl friend, he had either a pipe or crowbar in his hand and he was calling the defendant vulgar names and threatening him with abusive language. He also suggested that the defendant fight with him, instead of pushing a woman around. The defendant started walking away stating that he did not want any trouble. David Cage attempted to strike the defendant, but the defendant was able to avoid the blow because his girl friend called out a warning to him. After this unsuccessful attempt, David Cage returned to his tow truck and placed the pipe or crowbar in the back of the truck. He then reentered the cab of the truck, which was still running, and leaned down by the dashboard, below window level.
Defendant approached the tow truck holding a gun by his leg, and attempted to speak to the victim who still had his head ducked out of view. When David Cage raised his head, defendant raised his gun and shot the victim in the head. The defendant ran, the truck swerved to the right, hit a vehicle and then crashed into a church. The coroner testified that the victim died from the gunshot wound to his temple. Additionally, he testified that black marks surrounding the wound indicated that the gun had been placed close to the victim's head. Homicide detective Curole testified that he did not find any weapon in the cab of the tow truck; the record does not reflect whether the pipe or crowbar was found in the back of the tow truck.
The record indicates that only one shot was fired, although one of the witnesses, Tyronne Weber, who saw only the shooting and the events subsequent to the shooting, testified that he heard more than one shot. The gun was retrieved after the defendant told a detective where it could be found. Only three bullets remained unspent. The only two eyewitnesses to the shooting were Tyronne Weber and Cynthia Whitney.

Assignment of Error No. 3
Defendant contends that the trial court erred in denying his motion for a new trial on the basis that the state failed to disclose a statement made to the police by the defendant's girl friend. This is a written statement that was obtained by the police during the investigation of the victim's death. The defendant asserts that this statement constitutes Brady material because its presence might have produced a different outcome at trial. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
*1106 The defendant requested a copy of any statements of any person who had been interviewed by an agent of the state in connection with the subject matter of this case or matters related to the evidence, and whom the state did or did not intend to call at trial.[2] The state responded that a written statement had been taken from Cynthia Whitney, but did not supply the defendant with the contents of the statement, nor a copy of the written statement. The state indicated that it did not intend to call Cynthia Whitney at trial. She was subpoenaed by the state to testify at trial, appeared at the trial to testify, and was told by the state that she would not be needed. The defense counsel, during the trial, requested the trial court to issue an instanter subpoena for the appearance of Cynthia Whitney. She did not testify at trial and the written statement was entered into the record by the trial court at the hearing on the motion for a new trial.
The trial court, at the hearing on the new trial motion, determined that the statement was not Brady material and denied the motion for a new trial. The pertinent part of the withheld statement reads as follows:
"Q. Were you in the 2700 block of Washington Ave on Monday April 9-1979, and if so did you witness a shooting occur.
A. Yea, I was.
Q. Would you explain in your own words what you observed occur.
A. Me and Sonny and the baby were standing on the corner and I went across the street to the store to check on some milk for my baby. Then I went back to the corner where Sonny and the baby were and told him that I didn't have enough for the milk. Then Sonny told me to take the baby home, and I told him that I wasn't going home, that I was going to a friend's house in the Magnolia. Sonny then started walking to he momma house and I was following him with the baby. Then he turn around and saw me and I tried to run away with the baby but he caught me and grabbed me by the shoulder. Then he start squeeze me hard and I went to the ground. I was screaming for him to stop it but he didn't. Then the man in the truck saw me and he stop the truck and went to the back and got one of them pipes that you fix tires with. Then he come up to Sonny with the pipe and I told Sonny, look at that man behind you with the pipe. After that the man said `Nigger, leave that girl alone,' and he asked me, `baby is that man doing you anything'. Then the man started calling Sonny all kinds of punks and whores and all and I told Sonny not to tell him anything, so Sonny shut up. Then the man said that `that punk better not say nothing, or I'll pop him in his damned head with this pipe.' Then Sonny started walking the other way and he told the man to go on ahead, that he didn't want any trouble. I stayed on the corner and watched. Then the man came up behind Sonny and it looked like he tried to hit Sonny in the back of the head with the pipe, so I hollered to Sonny to watch out. Then I got scared so I went to the alley by Sonny momma house and watched. Then the man went back to the truck and put the pipe in the back and then he got in and was leaning down in the truck by the dashboard. The engine of the truck was still running. Then Sonny pulled his gun and he walked up the middle of the street and then stood by the truck holding *1107 the gun by his leg. Then Sonny was telling the man something but the man was still ducking his head in the truck. Then, when the man raised his head, I saw Sonny bring the gun up and shoot the man in the head. Then Sonny ran and I had saw the man truck curve to the side and then it hit a car and then it ran into the church.
Q. When you refer to Sonny, whom are you speaking about.
A. William Perkins.
Q. In which way are you acquainted with William Perkins.
A. I used to sleep with him sometimes and I had a baby for him.
Q. To your knowledge, did Sonny know the man that he shot in the truck.
A. I don't know he told me that he didn't.
Q. Did Sonny tell you anything else about the shooting.
A. After it happen, Sonny said that he didn't want to do it that his mind just snapped on him.
Q. Did you ever meet the man that Sonny shot before the day of the shooting.
A. No, that was my first time seeing him.
Q. Was Sonny beating you before the man walked up and told Sonny to stop.
A. He probable was going to hit me for to make me go home, but he was squeezing my shoulder.
Q. Where did Sonny go after he shot the man.
A. He went to his antee house on Baronne by Melpomene.
Q. When the man in the truck raised his head, was he attempting to drive the truck away from Sonny.
A. No, the truck started moving after Sonny shot him.
Q. Did you see the gun that Sonny used to shoot the man.
A. It was a little pistol, I didn't see the color. It sounded like either a .25 or a .22.
Q. What did Sonny do with the gun after he shot the man.
A. I don't know.
Q. Did the man push Sonny before the shooting.
A. Yea, he pushed him a little and told him, `Whore, you the kind that like to beat on woman, beat on me I'm a damned man.'
Q. Did Sonny tell you anything else about the shooting.
A. No, he just say that he didn't want to shoot him, that he mind just clicked, but he said that he just got tired of people mistreating him like that because that wasn't the first time a man mistreated him like that."
Under Brady, the suppression of favorable evidence by the prosecution, when production of such evidence is requested, violates due process when the evidence is material to either guilt or punishment, regardless of the good or bad faith of the prosecution. Brady v. Maryland, supra at 87, 83 S.Ct. at 1196-1197. See United States Constitution, Amendment XIV. See also C.Cr.P. 718. Furthermore, the Louisiana Constitution, Article 1, § 16 provides:
"... An accused is entitled to confront and cross-examine the witnesses against him, to compel the attendance of witnesses, to present a defense, and to testify in his own behalf." (Emphasis added).
The defendant cannot be expected to present a proper defense, and is denied a fair trial when the prosecution withholds evidence which has been requested and which is favorable to the defendant. The United States Supreme Court in United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), established three standards, depending on the type of request made by the defendant, to determine if the withheld evidence is Brady material. The request in the present case is a specific request, like the request in Brady, for the statements made by persons other than the defendant. This case is governed by the materiality standard set out in Agurs:
"... Although there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of *1108 such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge." United States v. Agurs, supra at 106, 96 S.Ct. at 2399.
See State v. Willie, 410 So.2d 1019, 1030 (La.1982); State v. Martin, 376 So.2d 300, 306 (La.1979). The test of materiality is whether the suppressed evidence "... might have affected the outcome of the trial." United States v. Agurs, supra 427 U.S. at 104, 96 S.Ct. at 2398. See State v. Willie, supra at 1030-31.
In many respects the statement of Cynthia Whitney substantially corroborates the defendant's version of the shooting,[3] and if it had been heard by the jury it might have affected the outcome as to either guilt or punishment.[4] In her statement Cynthia Whitney describes the prior argument between the victim and the defendant, and the repeated insulting and threatening language of the victim toward the defendant. Her statement stresses the fact that the victim attempted to strike the defendant with the pipe or crowbar prior to the shooting. Most importantly, her statement suggests that only one shot was fired by the defendant, rather than the two or three shots that the only other eyewitness, Tyronne Weber, heard. And her statement supports the defendant's version of the factsthat the victim leaned below window level as if to reach for something. Whitney's testimony could have supported a reasonable doubt, or a different verdict.
We find that Cynthia Whitney's written statement constitutes Brady material, and that the withholding of the contents of this written statement from the defendant is reversible error. The trial court should have granted the defendant a new trial based on this ground.

*1109 Assignment of Error No. 4

Defendant argues that the trial court erred when it allowed his written statement to be brought into the jury deliberation room after the jury had retired. The trial court denied the defendant's motion for a mistrial based upon this ground. The following colloquy points out that during its deliberations the jury asked to see the written statement of the defendant which he had given to the police, and that the trial judge had the statement sent into the jury room. The defense attorney was not present nor was he summoned before the defendant's written statement was sent into the jury deliberation room. The colloquy, between the defense counsel and the deputy, who took the statement into the jury deliberation room, took place after the jury returned a verdict of guilty against the defendant and prior to the sentencing stage of the trial:
"Q. State your name, please, sir.
A. Willie Moten. Criminal Sheriff, Orleans Parish.
Q. On this date, that is, January 22, 1980, did you have the occasion to act at the request of the jury to view exhibits offered in evidence?
A. Not at the request of the jury. At the request of the judge.
Q. On the judge's orders?
A. Yes.
Q. Would you presume the jury requested it?
BY THE DEFENSE: Do you wish to stipulate, Your Honor, the jury requested it?
BY THE COURT: Yes, sir. I'll stipulate to that.
EXAMINATION RESUMED BY DEFENSE:
Q. And you brought the exhibits into the jury room?
A. Right.
Q. Did you make any effort to contact me before bringing them in?
A. No.
Q. Did anybody ask that I be contacted before they were brought in?
A. I don't know. I was outside. The judge called for me in the back. I don't know.
Q. I show you now a series of exhibits and ask you if these are the exhibits that were brought into the jury room?
A. It seem to be the same thing I took in there. I didn't go through them when I took them in. I just picked them up and ...
Q. You brought them out from the stack in here.
A. The jury brought them back and put them there and I took them from the jury.
Q. I show you what has been previously marked as B-3, which purports to be a statement taken in the homicide division and ask you, did this go in the jury room?
A. If it came out the stack.
BY THE COURT: I'll stipulate it went in."
C.Cr.P. 793 provides an explicit legislative mandate as to what evidence can and cannot go into the jury deliberation room:
"A juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence. Testimony shall not be repeated to the jury. Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict. (Emphasis added).
This court has recognized that jurors may inspect physical evidence in order to arrive at a verdict, but they cannot inspect written evidence to assess its verbal contents. State v. Passman, 345 So.2d 874, 885 (La.1977); State v. McCully, 310 So.2d 833 (La.1975); State v. Freetime, 303 So.2d 487, 489 (La.1974); State v. Arnaudville, 170 La. 151, 127 So. 395 (1930); State v. Harrison, 149 La. 83, 88 So. 696 (1921).
The general rule as expressed by C.Cr.P. 793 is that the jury is not to inspect written evidence except for the sole purpose *1110 of a physical examination of the document itself to determine an issue which does not require the examination of the verbal contents of the document. For example, a jury can examine a written statement to ascertain or compare the signature, or to see or feel it with regard to its actual existence. State v. Freetime, supra at 489. The legislature has made an express choice in this instance, and this court must follow the explicit prohibition of article 793, of jury access to written evidence during the deliberations, except for the sole purpose of physical examination. As stated by this court in State v. Freetime, supra at 488-89:
"The policy choice thus represented is to require jurors to rely on their own memory as to verbal testimony, without notes and without reference to written evidence, such as to depositions or transcribed testimony. The general reason for the prohibition is a fear that the jurors might give undue weight to the limited portion of the verbal testimony thus brought into the room with them...."
In State v. Freetime, supra, this court found reversible error when the trial court permitted the jury to read the defendant's confession after retiring to deliberate. The written statement in this case, although not a confession, is an inculpatory statement made by the defendant, and the same danger which was present in Freetime is present in this case. This danger is that undue weight may be given to this particular piece of evidence. The legislature designed article 793 to prevent this precise danger. This legislative directive has not been amended, nor has Freetime been overruled: this court is bound to find that the sending of this written statement to the jury deliberation room is reversible error. The trial court should have granted the defendant's motion for a mistrial based upon this ground.
For the reasons assigned, the conviction and sentence are reversed, and the case is remanded to the district court for a new trial.[5]
CHARLES R. WARD, J. Pro Tem., concurs and will assign reasons.
DAVID R.M. WILLIAMS, J. Pro Tem., concurs.
WILLIAM H. BYRNES, J. Pro Tem., dissents.
NOTES
[*] Judges Charles R. Ward, William H. Byrnes, III and David R.M. Williams of the Court of Appeal, Fourth Circuit, participated in this decision as Associate Justices pro tempore, joined by Chief Justice Dixon and Associate Justices Calogero, Dennis and Watson.
[1] "First degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.

Whoever commits the crime of first degree murder shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence in accordance with the recommendation of the jury." R.S. 14:30 (as it appeared prior to amendment in 1979 by Acts 1979, No. 74, § 1, eff. June 29, 1979).
[2] The defendant requested in a document titled Bill of Particulars the discovery of specific items, and in paragraphs 10 and 11 he specifically requested the discovery of written statements of any person. Paragraphs 10 and 11 read as follows:

"10. Does the State have in its possession statements of any person who has been interviewed by an agent of the State in connection with the subject matter of this case or matters related to the evidence to be introduced in this case and whom the State does not presently intend to call at trial? If yes, please provide copy of same to the defendant.
11. Does the State have in its possession statements of any person who has been interviewed by an agent of the State in connection with the subject matter of this case or matters related to the evidence to be introduced in this case and whom the state does not presently intend to call at trial? If yes, please provide copy of same to the defendant."
[3] The following is the defendant's statement taken by the police when the defendant surrendered himself for the shooting. It is the defendant's version of the shooting, and it suggests that the shooting was either in self-defense (justifiable homicide) or was a heat of passion (manslaughter) shooting:

"Q. Do you know David Cage?
A. No, I don't.
Q. Did you shoot a man in the 2700 block of Washington Avenue on April 9th, 1979.
A. Yes.
Q. Would you explain in your words what occurred at that time?
A. I went to my mother's house on Washington Avenue with my lady friend, Cynthia Whitney, and I was trying to get her to go home with the baby. Then this dude walked up to me with a pipe in his hand and pushed me. The dude started calling me names and told me I had no business `fucking with the woman'. I told him that he had no business in my affair that it doesn't concern him. Then I walked off and he walked behind me. I told him to go ahead and get away from me. I turned around and saw him sitting in a tow truck across the street and I went back to try to talk to him. Then I called to him and told him to let me talk to him and it looked like he was searching for something in the cab of the truck. Then I pulled the gun out of my back pocket and fired it at him. Then I turned and ran because I did not know what to do.
Q. Where did you run to?
A. I ran down Clara Street towards Baronne Street.
Q. What kind of gun did you shoot the man with?
A. A nickle (sic) plated .25 Caliber Automatic with pearl handle.
Q. What did you do with the gun after you shot the man?
A. I wrapped it up in a brown paper bag and I hid it.
Q. Where did you hide the gun?
A. Underneath a house on Baronne Street.
Q. Can you point out the house where you hid the gun?
A. Yes.
Q. Why did you shoot and kill this man?
A. It was not my intention to shoot him, but I thought the gun was empty. I just wanted to scare him.
Q. Have you ever met the man that you shot before?
A. No, I have never met him.
Q. What time in the morning did you shoot this man?
A. I don't remember the exact time, it was between ten and eleven in the morning."
[4] The statement of Cynthia Whitney may have resulted in a different outcome as to guilt or punishment because it might have resulted in a responsive verdict of manslaughter. Further, it might have resulted in a finding of justifiable homicide (self-defense). The finding of manslaughter would have resulted in a lesser punishment. Finally, if the jury had found that the homicide was justifiable, the defendant would have been acquitted.
[5] To aid in the retrial of this case, another assignment of error which presents an issue will be discussed in this footnote. This is presented by the defendant as Assignment of Error No. 2. In this assignment the defendant maintains that the jury charge given by the trial judge was improper under the ruling in Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) since it shifted the burden of proof to the defendant. The portion of the charge which the defendant objects to is contained in part of the trial court's instruction relative to specific intent. In this part of the instruction the trial court presented a hypothetical example to the jurors in an attempt to explain the type of circumstances which infer intent. The court, when it finished the example, then stated that in such an instance the law would presume that a killing in such a manner was deliberate and intentional, and, therefore, done for the purpose of killing. Although this portion of the instruction is suggestive of constitutional problems, viewed in the context of the overall charge it does not present reversible error. The instruction as a whole does not present the danger the United States Supreme Court sought to eliminate. This instruction could not have created in the mind of a reasonable juror either a conclusive presumption or a direction to find intent upon proof of the defendant's voluntary acts; thus, it did not effectively shift the burden of persuasion as to the essential element of intent. Sandstrom v. Montana, supra at 517, 99 S.Ct. at 2455-2456. The trial court, however, should avoid any reference to "presumptions" made by the law, even if couched in mild language, when it presents its instructions to the jury at the new trial.