560 So.2d 700 (1990)
STATE of Louisiana, Plaintiff-Appellee,
v.
Warren Joseph LEWIS, Defendant-Appellant.
No. CR89-834.
Court of Appeal of Louisiana, Third Circuit.
April 18, 1990.
*701 Douglas J. Saloom, Lafayette, for defendant-appellant.
William Batin, Asst. Dist. Atty., Lafayette, for plaintiff-appellee.
Before GUIDRY, DOUCET and KING, JJ.
DOUCET, Judge.
This is an appeal from a conviction of second-degree murder.
On June 18, 1988, the defendant, Warren Joseph Lewis, was involved in a fight at Rosie's Bar in Lafayette, Louisiana, which resulted in the stabbing death of Donald Boudreaux. According to Noel Batiste, Jr., the manager of Rosie's Bar, the defendant arrived at the bar between 3:30 and 4:00 o'clock that afternoon. Also working at Rosie's that day was Ms. Sable Jolivette, the bartender. Mr. Batiste was the only person in the bar who knew the defendant and had seen him before.
James Sylvester is a regular patron of Rosie's Bar and has been ever since the establishment was opened. Mr. Sylvester testified that he arrived at the bar between 7:30 p.m. and 8:00 p.m. on the date in question. He testified that the defendant was already there when he arrived, and that the two spoke briefly while seated at the bar. The victim, Donald Boudreaux, came into the bar and asked Mr. Sylvester how he was doing. Mr. Boudreaux ordered a half-pint of whiskey from the bartender and had paid for it when Mr. Sylvester, who was seated nearby, heard the defendant say to Mr. Boudreaux, "You stepped on my feet."
Mr. Boudreaux replied, "If I stepped on your foot, I'm sorry." The defendant then said, "I should cut you." The victim replied, "If you want to cut me, go ahead on." Mr. Sylvester testified that he also heard Mr. Boudreaux say that he didn't want any trouble. At that point, the defendant pulled a knife with a large blade from his right pocket. Mr. Boudreaux again said that he wanted no trouble and attempted to leave the bar. Mr. Sylvester testified that the defendant blocked the door to prevent Mr. Boudreaux from leaving, and then began stabbing him repeatedly. The two men fell to the floor and began rolling. Mr. Boudreaux managed to get up and leave the bar, but fell down outside. It was established at trial that Donald Boudreaux was stabbed twelve times, and died due to excessive bleeding when the knife severed the femoral artery in his thigh.
Mr. Sylvester testified that he never saw a knife in Mr. Boudreaux's hand at any time, and that Mr. Boudreaux never tried to attack the defendant. He also said that the defendant dropped the knife on the *702 floor of the bar after he had stabbed the victim, but later picked the knife back up. Mr. Sylvester did not know the defendant, but had known Donald Boudreaux for approximately four years.
Rodney Jolivette, a patron of Rosie's since its opening, was also at the bar when the fight occurred, and gave his account at trial. Mr. Jolivette heard the defendant and the victim talking, but could not understand what was being said. He did hear Mr. Boudreaux say, "I'm scared," followed by a "click". Mr. Jolivette turned around and saw a knife with a large blade in the defendant's right hand. He said that Mr. Boudreaux "made a break for the door," but "couldn't open it fast enough." The defendant stabbed the victim repeatedly and the two men fell to the floor. Mr. Jolivette couldn't see which man was on top of which, however, because he was backing away from the fight. He testified that when the fight was over, Mr. Boudreaux tried to leave the bar, but fell down by the door and was assisted outside by a man called "June."
At trial Ms. Sable Jolivette gave her account of the incident as well. Ms. Jolivette testified that she was working behind the bar on the night in question, and had served defendant two beers. She did not see the two men speak, but saw Mr. Boudreaux walking toward the door afterwards. Ms. Jolivette said that she screamed at the men to stop fighting, but could not see who was fighting. She also pointed out that after the fight the defendant sat on a bar stool and waited for police to arrive.
Noel Batiste, the manager of Rosie's Bar, also testified at trial. Mr. Batiste was outside the bar when the fight started, but heard the commotion and went to investigate. When he opened the door, Mr. Boudreaux came outside, bleeding, and asked Mr. Batiste to take him to the hospital. Mr. Batiste called an ambulance. He observed the knife wounds on Mr. Boudreaux's stomach, noting that his intestines began protruding while waiting for the ambulance to arrive. Mr. Batiste went back inside and told the defendant that he would have to remain in the bar. Defendant replied, "I ain't going nowhere," and "The man messed with me, I put it on him." Mr. Boudreaux later died of his wounds.
Mr. Batiste said that the defendant had been drinking, but was not so drunk that he didn't know what he was doing. He also testified that while waiting for police and the ambulance to arrive, he saw the defendant go to the door of the bar and throw the knife outside, under the neon sign in front of the bar. Mr. Batiste said that he made sure that the knife was not touched until he saw police pick it up.
Donald Caesar of the Lafayette Police Department testified that he arrived at Rosie's Bar in response to a disturbance call. On arrival, he saw the victim on the ground bleeding. Sable Jolivette pointed out the defendant as the man who had stabbed Mr. Boudreaux. Officer Caesar found the defendant sitting on a barstool. The defendant had blood on his shirt and a pool of blood beneath him. The officer saw no wounds on the defendant. The defendant was read his rights and placed under arrest. He cooperated with officers until he was in the police unit, when he began kicking the door violently and cursing. Officer Caesar testified that the defendant threatened him, saying that he would kill him if he saw him on the street. Officer Caesar also noted that the defendant walked to the police unit under his own power and answered questions.
On July 14, 1988, the defendant, Warren Joseph Lewis, was charged by grand jury indictment with second degree murder, a violation of La.R.S. 14:30.1. At trial the defendant's attorney advanced the theories of self-defense and intoxication. On February 15, 1989, a twelve person jury found the defendant guilty as charged. He was sentenced by the District Court to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. The defendant has cited seven (7) assignments of error for his appeal to this Court. Assignments 1, 2, 3, and 5 were not briefed on appeal and are thus considered abandoned. State v. Dewey, 408 So.2d *703 1255 (La.1982). Three assignments of error remain to be considered.

ERRORS PATENT
The defendant in his assignments of error asks that the record be reviewed for errors patent. After carefully reviewing the record, we find none.

SUFFICIENCY OF THE EVIDENCE
The defendant argues that the jury's verdict was contrary to the law and evidence, because the evidence was insufficient to support a verdict of guilty beyond a reasonable doubt. As a result, he contends that his motion for a post verdict judgment of acquittal should have been granted.
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (La. 1979); State Ex Rel. Graffagnino v. King, 436 So.2d 559, at 563 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La.1981).
In order for the state to obtain a conviction, it must prove the essential elements of second degree murder beyond a reasonable doubt. La.R.S. 14:30.1 reads, in pertinent part, as follows:
§ 30.1. Second degree murder
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm;
Under this statute, the elements which must be proven beyond a reasonable doubt are the killing of a human being and the specific intent to kill or inflict great bodily harm. Since the defendant raised the defense of self-defense or justification, the state also had the burden of proving that the killing was not a justifiable act of self-defense. State v. Sylvester, 438 So.2d 1277 (La.App. 3rd Cir.1983); citing State v. Brown, 414 So.2d 726 (La.1982). The defendant's claim of intoxication was an affirmative defense. Therefore, the burden of proof was his in this regard. State v. Salas Martinez, 524 So.2d 871 (La.App. 3rd Cir.1988); writ denied, 525 So.2d 1047 (La. 1988).
The state presented testimony from several persons who were in the bar when the knifing occurred. The killing was not in dispute, as the defense admitted that defendant had killed the victim but claimed the killing was a justifiable act of self-defense. The testimony shows otherwise. Mr. Sylvester heard the defendant tell the victim, "I ought to cut you." (James Sylvester saw the defendant pull a knife and pursue the victim, stabbing him 12 times.) He also testified that the victim in no way tried to attack the defendant, and that he never saw the victim with a knife. Rodney Jolivette heard the victim say, "I'm scared," and heard a "click." Upon turning he saw a knife in defendant's right hand. He saw the defendant pursue the victim and stab him repeatedly. Noel Batiste testified that he heard the defendant say, "The man messed with me, I put it on him." He also saw the defendant throw the knife outside of the bar. It was established at trial that the defendant had no wounds other than a small nick on his hand. Dr. Remus, the pathologist, testified that the knife would have to have been thrust in with a considerable amount of force to sever the femoral artery in the victim's leg, although he did admit that the knife could have been plunged that deeply if the victim's weight were on top of it.
If this evidence is considered in the light most favorable to the prosecution, defendant's conviction must stand. The killing was admitted. The claim of self-defense was overcome by the evidence.
It is the role of the factfinder to weigh the credibility of the witnesses. The appellate court should not second-guess the credibility determinations of the trier of fact beyond sufficiency evaluations under the Jackson standard of review. See State Ex Rel. Graffagnino, supra, citing State v. Richardson, 425 So.2d 1228 (La.1983).
*704 Further, the defendant did not sufficiently carry his burden of proving his defense of intoxication at trial. He presented no witnesses and relied entirely upon his attorney's cross-examination of state witnesses to support his claim. Those who were in the bar and police officers who dealt with the defendant afterwards testified that the defendant had been drinking, but was able to walk under his own power and answer questions.
After viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the essential elements of second degree murder had been proven, and convicted the defendant accordingly.
As a result, this assignment of error has no merit.

WITNESS STATEMENTS
The defendant argues that the trial judge erred in denying his motion for an in camera inspection of the statements of witnesses who did not testify at trial. The record reflects that the defendant filed a motion for discovery on February 14, 1989, the first day of the trial. Within this motion, the defendant requested copies of any prior statements be examined in camera by the trial judge in order to determine whether they are of an exculpatory nature or material favorable to the defense. The trial judge denied the motion and refused to grant an in camera inspection.
La.C.Cr.P. art. 723 provides that the state is under no obligation to provide statements of witnesses to the defense unless the statements were made by the defendant himself. However, a defendant may not be denied exculpatory statements made by a witness other than the defendant provided the statement is material and relevant to the issue of guilt or punishment. State v. Ates, 418 So.2d 1326 (La. 1982); State v. Landry, 381 So.2d 462 (La. 1980). Where a specific request is made for such information and the subject matter of such a request is material, or if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the information to the trial judge. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). However, such a request must be specific and relevant. State v. Davenport, 399 So.2d 201 (La. 1981).
The record reflects that defendant requested any exculpatory evidence material to guilt, including that which could be used to impeach witnesses whose credibility may be determinative of guilt or innocence. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The motion also included a request for an in camera inspection of statements of witnesses not called to testify at trial in order to determine whether they were of an exculpatory nature.
In determining whether the trial court correctly denied the defendant's motion, we must first consider whether the defendant's request was specific enough. In State v. Perkins, 423 So.2d 1103 (La.1982), the Louisiana Supreme Court held that a request for statements of persons interviewed by an agent of the state and whom the state did not intend to call at trial was specific enough. Our examination of the record convinces us that the defendant's request for information was sufficiently specific, especially when considering the fact that he had no knowledge of the contents of the requested statements, or even the witnesses' names.
Under the circumstances, there is no way of determining whether the requested statements contain exculpatory information without an in camera inspection by the trial judge. Without such an inspection, the state's claim that the statements contain no exculpatory evidence must be taken at face value. In State v. Davenport, supra, at page 204, the court addressed a similar problem as follows:
"The state contends there are no material inconsistencies or exculpatory information in the statements in its file. Defendant has made no showing of any such inconsistencies or Brady information in the statements, but, of course, he *705 has no knowledge of the contents thereof.
If in such a situation the district attorney is wrong (and we say this without casting any aspersions whatsoever on the prosecutors of this state, because it is usually most difficult to determine whether or not inconsistencies or omitted information in witnesses' statements are material to the defendant's guilt), certainly the interests of justice would best be served by obtaining a judicial decision in this regard during the trial rather than later through post-conviction remedies. While such procedure will interrupt the trial and will be time consuming, we believe the added burden to our busy trial judges will be outweighed by the efficiency in the administration of justice." (footnote omitted.)
We conclude, as did the Davenport court, that the trial court should have made an in camera inspection of the requested material.
However, the mere existence in the statements of exculpatory information would not constitute a denial of the defendant's rights under Brady. It must also be determined whether the evidence, if it exists, is material to the guilt or punishment of the defendant, so that he was denied a fair trial by its inaccessibility. Davenport, supra.
Therefore, this case must be remanded to the trial court in order to determine: (1) whether the written or recorded statements obtained by the state contain exculpatory evidence; and, if so, (2) whether the evidence is material to the defendant's guilt or punishment.
If the trial judge's inspection reveals exculpatory evidence material to the defendant's guilt or punishment, a new trial will be required. If not, the conviction will be affirmed. The ruling after an in camera inspection by the trial court is subject to appeal.
Therefore, the conviction is affirmed, conditioned on a remand to the trial court for further proceedings in accordance with the views expressed in this opinion. The right to grant a new trial on the basis of its findings is reserved to the trial court. The right to appeal from any adverse ruling by the trial court is reserved to the defendant.
AFFIRMED CONDITIONALLY AND REMANDED.