NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**09-1392**

STATE OF LOUISIANA

VERSUS

D.D.

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 15578-05
HONORABLE DAVID S. RITCHIE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

**DAVID E. CHATELAIN**[\*]
**JUDGE**

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Billy Howard Ezell, and David E. Chatelain, Judges.

**CONVICTIONS AFFIRMED; REMANDED
FOR ESTABLISHMENT OF PAYMENT PLANS.**

**John F. DeRosier**
**District Attorney**
**Carla S. Sigler**
**Assistant District Attorney**
**1020 Ryan Street**
**Lake Charles, Louisiana  70601**
**(337) 437-3400**
**Counsel for:**
       **State of Louisiana**

---

[\*]Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Thomas L. Lorenzi**
**Lorenzi & Barnatt, LLP**
**518 Pujo Street**
**Lake Charles, Louisiana  70601**
**(337) 436-8401**
**Counsel for Defendant/Appellant:**
**D.D.**

**CHATELAIN, Judge.**

In this criminal case, the defendant, D.D.,[1] challenges his convictions for one count of sexual battery and two counts of molestation of a juvenile on the grounds of insufficiency of the evidence and trial court error in refusing to allow the jury to bring written alibi evidence into the deliberation room. We affirm.

## PROCEDURAL HISTORY

The defendant was indicted in Counts 1, 3, and 4 with sexual battery and in Counts 2, 5, and 6 with molestation of a juvenile, violations of La.R.S. 14:43.1 and 14:81.2.[2] Count 4 charged the defendant with committing sexual battery on a juvenile, B.J., on or about November 1, 1995 to December 31, 1995. Counts 5 and 6 charged the defendant with committing molestation of B.J. on or about May 1, 1996 to July 31, 1996, and January 1, 1998[3] to January 31, 1998. On October 8, 2008, a jury acquitted the defendant of Counts 1 through 3 and found him guilty as charged on Counts 4 through 6.

On March 6, 2009, the defendant filed a motion for new trial and a motion for post verdict judgment of acquittal. Following a hearing, both motions were denied. Sentencing took place on June 29, 2009. On each count of molestation of a juvenile, the defendant was sentenced to serve eight years in the Louisiana Department of Corrections, to run concurrently. All but three years were suspended on each count, with the defendant being placed on supervised probation for five years subject to the

---

[1]Initials are used throughout this opinion to protect the victim's identity. La.R.S. 46:1844(W).

[2]The indictment originally charged the defendant with violating La.R.S. 14:80, felony carnal knowledge of a juvenile, instead of La.R.S. 14:81.2, molestation of a juvenile. The indictment was amended on December 12, 2007 to affect that change.

[3]The December 12, 2007 amendment to the indictment changed the starting date of the molestation charged in Count 6 from November 1, 1998 to January 1, 1998.

1

conditions of La.Code Crim.P. art. 895 and other special conditions. On the sexual battery count, the defendant was sentenced to serve two years in the Louisiana Department of Corrections without the benefit of parole, probation, or suspension of sentence, to run concurrently with the other sentences imposed.

## FACTS[4]

The victim, B.J., whose date of birth is April 21, 1981, testified that at the time of trial, he was twenty-seven years of age and living in Lake Charles, Louisiana. As a young child, B.J.'s family moved around due to his father's employment, but when B.J. was five, the family returned to their home in Moss Bluff. In April of 1994, B.J.'s family sold the Moss Bluff home and moved to Kentucky. B.J. attended eighth grade in Kentucky and midway through his first year of high school, which was around November of 1995, the family moved back to the Lake Charles area.

In 1998, B.J. reported incidents of inappropriate behavior by D.D., his father's first cousin, after B.J.'s mother and brother confronted him regarding a note his mother found indicating he might be involved in a homosexual relationship. In a statement given to a detective with the Calcasieu Parish Sheriff's Office, D.D. stated that his date of birth is February 21, 1946.

**Count 4**

B.J. testified about an incident involving D.D. that occurred at B.J.'s grandmother's house in November or December, 1995, when his grandfather, E.J., was either sick or had just passed away.[5] B.J. recalled his grandfather dying around December of 1995, when B.J. was fourteen. The incident occurred at night and was

---

[4]The details of Counts 1 through 3 are not discussed herein because the defendant was acquitted of those charges.

[5]B.J. initially testified that this incident occurred after his grandfather passed away.

initiated when D.D. went outside to smoke. While out of view of everyone but B.J., D.D. motioned for B.J. to join him outside. Although B.J. felt uncomfortable, he walked outside. D.D. and B.J. walked to the utility room in the back of the carport. B.J. testified that D.D. was looking for an electrical device kept in B.J.'s deceased grandfather's toolbox.[6] D.D. asked B.J. to squat beside him, and D.D. knelt beside B.J., put his hand on B.J.'s thigh, and massaged his groin area over his clothes. The incident ended when B.J.'s grandmother came out of the house to see if D.D. had found what he was looking for.

**Count 5**

B.J. testified that another incident with D.D. occurred after he and his family moved back from Kentucky.[7] D.D. picked him up from the skating rink in Moss Bluff earlier than his mother's normal arrival time of 11:00 or 11:30 p.m. The two left the skating rink and D.D. stopped the car, told B.J. that it had been a long time since he had seen B.J. and that he wanted B.J. to give him a kiss. B.J., who had never kissed anyone, leaned over and kissed D.D. B.J. testified that D.D. put his tongue in B.J.'s mouth and touched B.J.'s groin area over his clothes. B.J. testified that he was aroused during the encounter.

**Count 6**

Finally, B.J. testified that he recalled another incident that occurred after they moved back from Kentucky and were living in the Moss Bluff townhouse his parents had purchased. While B.J.'s parents were out, D.D. and his wife, J.D., stopped by to

---

[6]On cross-examination, B.J. testified he was not sure if his grandfather's death occurred in December of 1995.

[7]B.J. testified that he believed this incident occurred before he turned fifteen, but he was not certain. On cross-examination, B.J. testified that the incident occurred between the time he moved back from Kentucky and the time he turned fifteen.

visit. B.J. went upstairs and D.D. entered his room, sat on the edge of the bed next to B.J., put his hand in B.J.'s groin area over his clothes, and massaged him. B.J. testified that he was aroused. D.D. put B.J.'s hand on D.D. "through his pants" and D.D. also touched B.J. on his genital area under his pants. D.D. then performed oral sex on B.J. B.J. attempted to perform oral sex on D.D. because he thought that is what D.D. wanted.

In later testimony, B.J. recalled getting on the floor on his hands and knees with D.D. behind him. Both were clothed. D.D. "let his groin area press against [B.J.'s] rear end" and he asked B.J. if he liked it. D.D. then wanted B.J. to try it on him. As B.J. approached D.D. from behind, B.J.'s father returned home and came upstairs, so he and D.D. quickly got up. B.J. testified that to the best of his knowledge, the incident occurred between January and March of 1998.[8]

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, this court reviews all appeals for errors patent on the face of the record. After reviewing the record, there is one error patent.

As a condition of probation, the trial court ordered the defendant to pay a $500.00 fine and court costs. However, the trial court failed to establish a payment plan for the payment of the fine and costs. "When [a] fine and costs are imposed as a condition of probation, but the trial court is silent as to the mode of payment . . . , this court has required a specific payment plan be established." *State v. Wagner*,

---

[8]B.J. initially testified this incident occurred prior to the time he had his back surgery, which was when he was sixteen; however, his later testimony indicated this occurred after his back surgery. He testified that he had surgery in the summer, and he recalled this incident as occurring the following spring. After looking at his notes that he had prepared the night before, B.J. testified that to the best of his knowledge, this incident occurred between January and March of 1998, when he was sixteen.

07-127, p. 7 (La.App. 3 Cir. 11/5/08), 996 So.2d 1203, 1208. Therefore, we will remand this case to the trial court for establishment of a payment plan for the fine and court costs. As we noted in *State v. Stevens*, 06-818 (La.App. 3 Cir. 1/31/07) 949 So.2d 597, the payment plan may either be formulated by the trial court or by Probation and Parole, with the trial court's approval.

## ASSIGNMENT OF ERROR NUMBER TWO

This assignment of error is being addressed first because it concerns sufficiency of the evidence. *See State v. Hearold*, 603 So.2d 731 (La.1992).

In Count 4, the defendant was convicted of sexual battery, which is defined in La.R.S. 14:43.1 in pertinent part as follows:

> A. Sexual battery is the intentional engaging in any of the following acts with another person, who is not the spouse of the offender, where the offender acts without the consent of the victim, or where the other person has not yet attained fifteen years of age and is at least three years younger than the offender:
>
> (1) The touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender;

The defendant does not contend that any of the statutory elements are lacking; rather, he contends that the offense charged in Count 4 required his presence in Calcasieu Parish to attend E.J.'s funeral in December of 1995 and that the State failed to prove this fact. In support of his argument, he points to several defense witnesses' testimonies which, he claims, establish that he was not in Lake Charles around the time of E.J.'s funeral.

At trial, B.J. testified that he recalled the incident charged in Count 4 occurring when his grandfather, E.J., was either sick or had just passed away. He testified that his family spent a lot of time at his grandparents' house during his grandfather's

5

illness, and that, to the best of his recollection, the incident happened in November or December of 1995. B.J. recalled his grandfather's death as occurring around December of 1995, when he was fourteen.

B.J.'s mother testified that one of the reasons their family moved back home in November of 1995 was her father-in-law's illness and that he passed away on December 5, 1995. She recalled a family gathering around the time of her father-in-law's funeral at which the defendant was present. She recalled that D.D. went outside to smoke, and she explained that he frequently did this to hide it from his wife. When D.D. wanted to smoke, he would often use B.J. as an excuse to go outside to look at something or to go for a walk. B.J.'s mother recalled on this occasion, D.D. nodded for B.J. and the two went out the front door. This event stands out to her "[b]ecause as [B.J.] related things to me and as he began telling me various things that happened[,] I recognized it."

The Defense called several witnesses in an attempt to prove that D.D. was not in Louisiana around the time of E.J.'s funeral. The defendant's mother, M.D., testified that the defendant was living in Las Vegas in November and December of 1995. M.D. testified that on November 28, 1995, she and her husband came to Lake Charles due to the illness of her brother-in-law, E.J. They left Lake Charles on December 19, 1995 to return home. The defendant was not present in Lake Charles during this period of time because he had pneumonia and could not make the trip. M.D. testified that the defendant and his wife visited her in Tuscon from December 27, 1995 to January 2, 1996. C.C., the defendant's sister, testified that three or four days after her uncle E.J. died, she and her husband visited the defendant in Las Vegas for two to three days. The defendant's daughter, S.S., testified that she

did not think her father was at E.J.'s funeral and that she did not recall seeing him there.

J.D., the defendant's wife, testified that she was in Lake Charles the entire week of Thanksgiving of 1995 due to her stepfather, P.C.'s illness. The defendant flew into Houston the Wednesday night before Thanksgiving and, after she picked him up at the airport, they returned to Conroe, Texas. On Thanksgiving Day, the two traveled to Lake Charles to start making arrangements for the funeral of her stepfather. P.C.'s funeral was held Saturday, and that afternoon, they returned to Conroe. On cross-examination, J.D. testified that B.J.'s family did not attend the wake or funeral of her stepfather. The defendant flew back to Las Vegas Sunday morning, and he did not return to Lake Charles for E.J.'s funeral due to illness. J.D. testified that the defendant returned to Conroe the weekend before Christmas, and she did not think they went to Lake Charles for Christmas, but if they did, they left the following day. The day after Christmas, they visited the defendant's mother in Tuscon, and they remained there until the day after New Year's.

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact-finder to weigh the respective credibility of the witness, and therefore the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for the State to obtain a conviction, it must prove the elements of the crime beyond a reasonable doubt.
>
> A determination of the weight of evidence presented is a question of fact. The resolution of a matter where conflicting testimony exists

requires a determination of credibility of the witnesses and is a matter of weight of the evidence and not sufficiency. *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. *State v. Nolan*, 503 So.2d 1186 (La.App. 3 Cir.), *writ denied*, 507 So.2d 226 (La.1987).

A fact-finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. *Jackson*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. Where rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all evidence most favorable to the prosecution must be adopted on review. Only irrational decisions to convict by the trier of fact will be overturned. *See State v. Mussall*, 523 So.2d 1305 (La.1988).

*State v. Taylor*, 96-1043, pp. 4-5 (La.App. 3 Cir. 2/5/97), 688 So.2d 1262, 1267.

The guilty verdicts returned in this case indicate that the jury accepted the testimony of the State's witnesses and rejected that of the Defense's witnesses. As stated in *Taylor*, this court cannot second-guess the credibility determinations made by the jury. Accordingly, this claim has no merit.

Next, the defendant claims that the convictions on Counts 5 and 6 are a result of the trial court's denial of the jury's request to be provided with the alibi exhibits. His argument is as follows:

Convictions of counts five and six are a consequence of the trial court's erroneous ruling denying the jury's request to be provided with the alibi exhibits during deliberations. Otherwise, the jury disregarded the unchallenged authenticity of the proof of the alibi documents themselves because they became lost in the personal animosity between Ms. Beyl, the bookkeeper, and Ms. Harris, the owner. Regardless of the greater credibility which may be accorded Ms. Harris' testimony in deference to the standard of review to which the state is entitled, the veracity of the documents was unchallenged. The documents were original or contemporaneous copies and an examination by the jury, following Mrs. Harris' rebuttal testimony would, have resolved the jury's questions concerning their authenticity in requesting the exhibits.

We interpret the foregoing as a restatement of the argument presented in Assignment of Error Number One, i.e., that the jury should have been allowed to

examine Defense Exhibits D-5 and D-6 during its deliberations. Accordingly, we will address this argument in the discussion that follows.

## ASSIGNMENT OF ERROR NUMBER ONE

The defendant contends that the trial court abused its discretion in not granting the jury's request to examine the defendant's exhibits of expense receipts from the summer of 1996 and for January 1998. He argues that if provided the documents, the jury could have determined they were original, which would have refuted the "red herring" perception created by the prosecution that the documents' authenticity was questionable.[9] The defendant contends that the jury could see from an examination of the documents that either they were original, or, if a faxed copy, bore Ms. Beyl's original handwriting. He submits that the jury's examination of the documents would have "weighed heavily on its assessment of the documents by establishing their originally [sic] and authenticity."

The trial court minutes indicate that the jury sent a note requesting the defendant's exhibits of expense receipts for the summer of 1996 and for January 1998. After hearing counsels' arguments, the trial court ruled that the law does not allow the jury to be given written evidence during its deliberations and forwarded a note stating such to the jury.

Louisiana Code of Criminal Procedure Article 793 states, in pertinent part:

> A. Except as provided in Paragraph B of this Article, a juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence. Testimony shall not be repeated to the jury. Upon the request of a juror and in the

---

[9]The State presented rebuttal testimony of Diane Harris, the owner of Environmental Design & Construction, Inc., the company where the defendant and Ms. Beyl worked. She testified that she never gave anyone authorization to take records from her office and that she would never have allowed the originals to be taken out of the office. Ms. Harris was shown D-5 and D-6; she identified them as expense reports from her office but testified that various documents were missing, such as the actual credit card receipts.

discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict.

In *State v. Ray*, 577 So.2d 354 (La.App. 1 Cir.), *writ denied*, 580 So.2d 668 (La.1991), the defendant contended that the trial court erred in denying the jury's request to review medical records during deliberations. The first circuit, in holding that the claim lacked merit, stated:

> The general rule as expressed by La.C.Cr.P. art. 793 is that the jury is not to inspect written evidence except for the sole purpose of a physical examination of the document itself to determine an issue which does not require the examination of the verbal contents of the document. *State v. Perkins*, 423 So.2d 1103, 1109 (La.1982); *State v. Rodriguez*, 476 So.2d 503, 508 (La.App. 1st Cir.1985).
>
> The medical records themselves were not documents which raised an issue in this case. The only reason that these records could be of any assistance to the jury was if they were examined for their verbal contents. *See, State v. Johnson*, 541 So.2d 818, 824 (La.1989). Thus, it is apparent that the jury wanted to re-examine the verbal contents of the medical records. Such an examination is prohibited by La.C.Cr.P. art. 793.

*Id.* at 357-58.

In *State v. Perkins*, 423 So.2d 1103, 1109-10 (La.1982), our supreme court stated:

> This court has recognized that jurors may inspect physical evidence in order to arrive at a verdict, but they cannot inspect written evidence to assess its verbal contents. *State v. Passman*, 345 So.2d 874, 885 (La.1977); *State v. McCully*, 310 So.2d 833 (La.1975); *State v. Freetime*, 303 So.2d 487, 489 (La.1974); *State v. Arnaudville*, 170 La. 151, 127 So. 395 (1930); *State v. Harrison*, 149 La. 83, 88 So. 696 (1921).
>
> The general rule as expressed by C.Cr.P. 793 is that the jury is not to inspect written evidence *except* for the sole purpose of a physical examination of the document itself to determine an issue which does not require the examination of the verbal contents of the document. For example, a jury can examine a written statement to ascertain or compare the signature, or to see or feel it with regard to its actual existence. *State v. Freetime,* supra at 489. The legislature has made an express choice

10

in this instance, and this court must follow the explicit prohibition of article 793, of jury access to written evidence during the deliberations, except for the sole purpose of physical examination. As stated by this court in *State v. Freetime*, supra at 488-89:

> "The policy choice thus represented is to require jurors to rely on their own memory as to verbal testimony, without notes and without reference to written evidence, such as to depositions or transcribed testimony. The general reason for the prohibition is a fear that the jurors might give undue weight to the limited portion of the verbal testimony thus brought into the room with them. . . ."

During trial, Ms. Beyl testified as to the information contained in D-5 and D-6. Copies of these exhibits were published to the jury, as were the originals. The fact that the jury viewed the original exhibits during trial dispels the defendant's contention on appeal that the jury was denied the opportunity to determine that these were original, authentic documents.[10] Thus, it seems more likely that the jury requested the documents to examine their content. Such an examination is clearly prohibited by La.C.Cr.P. art. 793. Under the circumstances, we cannot say that the trial court erred in refusing to allow the jury to view these exhibits during its deliberations.

**DECREE**

The defendant's convictions are affirmed. The case is remanded to the trial court for establishment of payment plans for the fine and court costs, which plans may either be determined by the trial court or by Probation and Parole, with the trial court's approval.

---

[10]There is no indication in the record as to why the jury wanted these documents during deliberations. The record contains only the minutes concerning the jury's note requesting the documents and the trial court's response to that request. The minutes state that argument was presented by counsel for the State and for the Defense, but it does not provide the basis thereof. There is no indication in the minutes and no current contention by the defendant that he made this argument to the trial court.

**CONVICTIONS AFFIRMED; REMANDED FOR ESTABLISHMENT OF PAYMENT PLANS.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules—Courts of Appeal, Rule 2–16.3.