PITMAN, J.
Defendants Brittany Spruell and Corey R. Spann, Jr., were each convicted of second degree cruelty to juveniles and sentenced to 40 years at hard labor. They appeal their respective convictions and sentences. For the following reasons, we affirm.
FACTS
On November 24, 2015, the state filed a bill of information charging Spruell with one count of second degree cruelty to juveniles.[1] On August 2, 2016, the state filed a motion to join the cases of Spruell and Spann for trial, and the trial court signed an order joining the cases. On August 28, 2017, the state filed a motion to amend the bill of information to join Spruell and Spann for trial, and the trial court signed an order to amend the bill of information.[2]
*402 The state then filed a bill of information charging Spruell and Spann with one count each of second degree cruelty to juveniles, alleging that they committed this crime on or about September 27, 2015, in West Carroll Parish. The victim of these charges is Spruell's son, M.P., whose date of birth is February 20, 2012.
On August 2, 2016, the state filed a notice of intent to use evidence of others crimes, i.e., a charge of second degree cruelty to juveniles pending against Spann in Union Parish and a protective order issued in relation to the Union Parish charges prohibiting him from having any contact with M.P. The state alleged that the other crimes evidence would be used at trial to show his intent to commit the West Carroll Parish charge and as evidence of his system of crimes against M.P. On August 22, 2017, the state filed a second notice of intent to use evidence of other crimes, i.e., his willful and repeated violations of the Union Parish protective order.
On August 28, 2017, Spruell and Spann's case was set for a preliminary examination and a hearing on other motions, including the state's request to use other crimes evidence. Keith Blackmon, a former detective with the Union Parish Sheriff's Office, testified about his investigation of two prior incidents involving M.P. and Spann. Det. Blackmon stated that in August 2014, he was notified by Child Protective Services ("CPS") that M.P. had suffered burns to his face from a pot of boiling water. In September 2014, M.P. was injured while in the sole care of Spann. As a result, M.P. was hospitalized and diagnosed with bleeding on his brain, bleeding behind his eye, a lacerated liver and diffuse bruising. Doctors opined that M.P. had been abused and that his injuries were caused by blunt force trauma. Spann was charged with second degree cruelty to juveniles; and, on September 29, 2014, a protective order was issued prohibiting him from having any contact with M.P. or his family. The protective order was made effective until September 29, 2016. Following additional testimony related to the preliminary examination and other motions, counsel for Spruell argued that admission of the Union Parish incidents and the protective order would unfairly prejudice her. The trial court took the matter under advisement.
On November 2, 2017, the day of trial, counsel for Spruell raised an objection to allowing the state to use the other crimes evidence, arguing that his client would be unfairly prejudiced by the state's reference to Spann's pending Union Parish charges and the protective order. Noting Spruell's concern, the trial court ruled to permit the use of the other crimes evidence.
At trial, Erica Elliott Brumley testified that in September 2015, she worked as a registered nurse in the emergency room of West Carroll Memorial Hospital. She recalled Spruell bringing her three-year-old son, M.P., into the emergency room at approximately 11:00 a.m. on September 28, 2015. Spruell told her that she found M.P. on the floor beside his bed that morning. Spruell noted that she thought M.P. had had a seizure one year prior, but she could not give his history because CPS had removed M.P. from her care at that time. Nurse Brumley described M.P. as "unresponsive ... limp, pale, cold" and observed bruising on his body. He had a hematoma on his head. She identified photographs she took of M.P. on that day, showing bruising to M.P.'s right hip, upper right *403 rib cage, back and chin. The bruising on M.P.'s back varied in color, which indicated that the bruises were at various stages of healing and had occurred at different times. She further testified that M.P. was unresponsive and his teeth were clenched, which indicated a possible seizure. Medical personnel administered Ativan to M.P., and he was transferred to St. Francis Medical Center to be treated by a pediatric specialist. She stated that she suspected that M.P. had been physically abused, so she notified CPS. During cross-examination, she identified a report interpreting results of a CAT scan taken at West Carroll Memorial Hospital and stated that there was no showing that M.P. had suffered a brain injury. She explained, however, that the signs and symptoms of a brain injury are not always immediately evident on a CAT scan and may progress over time.
Det. Blackmon testified that in 2014, he investigated allegations of child abuse against Spann involving M.P. He identified a bill of information filed in Union Parish that charged Spann with two counts of second degree cruelty to juveniles, alleged to have occurred on September 6 and 7, 2014. He also identified a Union Parish protective order ordering Spann not to "abuse, harass, stalk, follow, or threaten," go within 100 yards of M.P., contact M.P.'s family or go to M.P.'s residence or school. The order was signed September 29, 2014, and was effective until September 29, 2016. He identified Spann as the same person listed in the Union Parish bill of information and protective order. He stated that the charges against Spann were still pending in Union Parish, and the protective order was still in effect after being extended.
Kristi Thomas testified that in September 2015, she was an investigator for the Department of Children and Family Services, also known as CPS, when the agency received a phone call regarding possible physical abuse of M.P. by Spruell and Spann. During her investigation of these allegations, she became aware of the investigation and protective order in Union Parish and that CPS had previously removed M.P. from Spruell's care and did not recommended that he be returned-although he was returned to Spruell's custody in July 2015. On September 29, 2015, Thomas visited M.P. at St. Francis Medical Center where he was in the pediatric intensive care unit. M.P. was unconscious, unresponsive and on a ventilator. Thomas identified a series of photographs she took of M.P. at approximately 1:30 p.m. that afternoon. They showed him connected to a ventilator with a swollen face and neck. There was a large scrape under his chin and on his neck and a scrape from his hip to his back. There were bruises on his feet, back and legs. His head was shaved and a tube was protruding from the top of his head to relieve cranial pressure from his swollen brain. Based on their history and photographs posted on Facebook on August 24, 2015, Thomas was convinced that Spruell and Spann were living together in September 2015. Two of the photographs from Facebook were of Spruell and Spann together, and another photograph was of M.P., his sister and another child. When Thomas spoke with Spruell, she denied having any contact with Spann or being in a relationship with him. At the time of trial, CPS continued to monitor M.P. Thomas stated that M.P. was in foster care, attended a pediatric daycare and no longer required the use of a feeding tube. However, M.P. had very limited use of his right hand, had issues with depth perception and was unable to see out of his right eye. Thomas stated that during her last visit with M.P., who was five years old at the time, he used only three words ("no,"
*404 "stop" and "hey") to communicate with her.
Det. Charles Irby of the West Carroll Sherriff's Office testified that on September 29, 2015, he returned a call from Kristi Thomas, which led him to initiate an investigation into Spruell and Spann related to M.P. That evening, Det. Irby interviewed Spruell after she waived her Miranda rights. She confirmed the charges against Spann in Union Parish and the protective order, but she claimed that she had ended her relationship with him and had not seen him in almost a year. Spruell denied living with Spann and said that she had been alone with M.P. at her house for the three days before he was injured. She stated that on the evening of September 27, 2015, she gave M.P. a bath around 11:00 p.m. and saw no bruises or other injuries on him, other than a scrape on his foot. She then put him to bed. When M.P. did not awaken by 10:00 a.m. the next morning, she went to his bedroom and found him on the floor. His body was rigid, and he had vomited on himself. She removed his clothing, wrapped him in a blanket and drove him to the West Carroll Memorial Hospital. She told Det. Irby that she thought M.P. had fallen from his bed onto some toys on the floor.
Det. Irby learned that Spruell and M.P. lived at a house located at 367 Barefoot Road. The owner of the house, Grace Sanders, provided him with a copy of a lease agreement, which was signed by Spruell and Spann as tenants. He also determined that Spann had initiated electrical service at the home.[3] On October 7, 2015, he executed a search warrant for the residence and found a copy of the September 2014 Union Parish protective order and a copy of Spann's birth certificate inside a drawer in a bedside table in the master bedroom. He located what appeared to be a game score sheet listing several names, including Spann. He found a check endorsed by Spann, two utility bills addressed to Spann for a different address, two paychecks made payable to Spann, a pair of adult men's boots, an assortment of men's clothing, a beard trimmer and men's deodorant. He also found a pair of men's underwear on the bathroom floor. He inspected M.P.'s bedroom and measured from the top of M.P.'s mattress to the floor, which was 13 inches in distance.
Based on his investigation, Det. Irby obtained an arrest warrant for Spann for violation of a protective order. Spann waived his Miranda rights and gave a statement denying residing at 367 Barefoot Road or knowing anything about the score sheet found there. He claimed that he slept at his father's house on the evening of September 27, 2015, and returned to 367 Barefoot Road the next morning to feed his dog. According to Spann, when he arrived, he noticed that the dog had gotten out of the house, and he located it down the street. Det. Irby noted that Spann told his boss that M.P. had passed away so he could have enough time off of work to accumulate the money to bond himself and Spruell out of jail.
Det. Irby obtained cell phone records for Spruell and Spann from AT & T.[4] The *405 records indicated that at 6:30 p.m. on September 27, 2015, Spann's cell phone accessed a cell phone tower in Forest, Louisiana, which is the tower closest to 367 Barefoot Road. Spann's cell phone also accessed this tower when he made his next call at 9:37 a.m. on September 28, 2015. During the same time period, his cell phone did not access the cell phone tower closest to his father's home, where he told Det. Irby he had spent the night on September 27, 2015. Det. Irby explained that a cell phone generally accesses the cell phone tower closest to its location.
Carlas Spann, Spann's uncle, testified that he, his wife, his brother (Spann's father), Spruell and Spann played a card game at 367 Barefoot Road prior to the weekend M.P. was injured. He identified the score sheet found by Det. Irby as the score sheet the group used while playing cards. He confirmed that M.P. was at the house when Spann was there playing cards. He stated that Spann and Spruell were in a boyfriend-girlfriend relationship.
Brandon Burch witnessed Spruell and Spann sign the rental agreement to 367 Barefoot Road. In August and September 2015, he lived down the street from 367 Barefoot Road and recalled seeing Spann riding a lawnmower while Spruell and M.P. were standing in the yard.
As owner of the house, Sanders testified that she was contacted by Spann on July 24, 2015, through a message on Facebook, about renting 367 Barefoot Road. She and Spann exchanged messages, and she advised him of the rent and security deposit amounts. Spann asked to see the house, and she agreed to meet him there that evening. She stated that Spruell, Spann, a young girl and a young boy met her at the house. In a message sent at 7:37 p.m. after viewing the house, Spann told her, "[W]e want it." On July 25, 2015, she sent Spann another message asking for his "wife's name," and he responded, "Brittany." On July 29, 2015, she, Spruell and Spann met to sign the lease, which was witnessed by Burch and Virginia Helmer. She recalled that she assumed the young boy with them was their son. She stated that she lived down the street from 367 Barefoot Road and recalled seeing Spruell, Spann and M.P. together at the house from time to time. On the morning of September 28, 2015, she saw Spann in her yard retrieving his dog. She spoke with him about the dog for a few minutes and remembered that he was wearing plaid pajama pants and a T-shirt at the time. On October 7, 2015, Spruell sent her a text message stating that she was moving out and asked if she would mail her a check for return of the deposit.
Dr. Aristoteles Pena-Miches, accepted as an expert in pediatric neurology, treated M.P. at St. Francis Medical Center on September 29, 2015. He performed a lumbar puncture to try to determine why M.P. had not woken up after having seizures. When he undressed M.P. to perform the procedure, he noticed bruising on M.P.'s back. The lumbar puncture indicated that M.P. had "incredibly" elevated intracranial pressure that was so high it required a pediatric neurosurgeon to place an intracranial pressure monitor into his skull. Analysis of the fluid taken during M.P.'s lumbar puncture did not reveal any abnormality indicative of an infectious disease, such as encephalitis or meningitis. He concluded that the swelling of M.P.'s brain was caused by abusive trauma. Additionally, he stated that there was no clinical condition that he was aware of that would cause the "patchy, focal, localized *406 bruises in different areas of the body, in different areas of evolution." He also noticed bruises and petechiae, small red dots on the skin caused by broken capillaries, on M.P.'s neck, which indicated that the area had been squeezed. He opined that M.P. had been "kicked on the floor or he was hit with a very specific instrument that did not injure the skin around it." When asked whether M.P. could have sustained his injuries from falling from his bed, which was 13 inches off the ground, he replied, "Absolutely not.... you don't get a generalized cerebral edema with falls." He testified that he spoke with Spruell after examining M.P. and advised her that he was going to contact CPS. Spruell told him that she did not know what had happened to M.P.
Dr. Pena-Miches identified photographs of M.P. and images from a CAT scan and MRI taken of M.P.'s head. The CAT scan images showed swelling and damage to the area of M.P.'s brain that affects vision, communication and behavior. The injuries corresponded to M.P.'s difficulties with vision and speech, as well as his abnormal, hyperactive impulsive behavior. A more recent MRI image, taken April 26, 2016, indicated atrophy of M.P.'s brain and that he had the brain of a 95-year-old. At the time of trial, he was still treating M.P. and explained that he is "severely neurologically handicapped with no chances for independent life."
During cross-examination, Dr. Pena-Miches conceded that there have been cases where a child has suffered serious intracranial injury after a short fall, but those cases are "one in a million." He opined that the bruises found on M.P. were caused by either a fist, shoe or some other sort of blunt object. He also stated that it would be unusual for a child to get bruises on his back from falling.
On November 3, 2017, the jury unanimously found Spruell and Spann guilty as charged of second degree cruelty to juveniles. Following hearings on February 21, 2018, the trial court sentenced both Spruell and Spann to 40 years at hard labor. Both Spruell and Spann filed a motion to reconsider sentence, and the trial court denied these motions.
Spruell and Spann appeal their respective convictions and sentences.
DISCUSSION - SPRUELL[5]
Evidence in Jury Deliberation
In her first assignment of error, Spruell argues that the trial court erred in ruling that the jury could review Nurse Brumley's written notes and the radiologist report from West Carroll Memorial Hospital during deliberation. She contends that allowing jurors to have access to this written testimonial evidence during deliberation, contrary to its explicit prohibition in La. C. Cr. P. art. 793, prejudiced her in the minds of the jurors and affected the verdict they reached, thus creating reversible error.
The state argues that the submission of Nurse Brumley's notes and the radiologist report to the jury during deliberation was not error. It contends that the reports were exhibits that were part of M.P.'s medical records, not testimonial documents.
*407 It notes that the radiologist report was a defense exhibit that showed no subdural hematoma, i.e., no brain injury, at the time a CAT scan of M.P. was taken. Furthermore, the state asserts that any error in allowing the jury to have a copy of the documents was harmless in light of the evidence of Spruell's guilt.
La. C. Cr. P. art. 793(A) provides, in pertinent part:
[A] juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence. Testimony shall not be repeated to the jury. Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict.
Generally, a jury is not to inspect written evidence except for the sole purpose of a physical examination of the document itself to determine an issue which does not require the examination of the verbal contents of the document. State v. Zeigler , 40,673 (La. App. 2 Cir. 1/25/06), 920 So.2d 949, writ denied , 06-1263 (La. 2/1/08), 976 So.2d 708, citing State v. Perkins , 423 So.2d 1103 (La. 1982). A jury can examine a written statement to ascertain or compare a signature or to see or feel it with regard to its actual existence but not to examine its verbal contents. State v. Zeigler , supra , citing State v. Perkins , supra . Louisiana courts have reversed convictions where the jury viewed a defendant's confession or written statement or re-examined verbal testimony during deliberations. State v. Perkins , supra ; State v. Zeigler , supra , citing State v. Adams , 550 So.2d 595 (La. 1989), State v. Buras , 459 So.2d 756 (La. App. 4 Cir. 1984), and State v. Gracia , 527 So.2d 488 (La. App. 5 Cir. 1988).
Although the erroneous presentation of written, documentary evidence to the jury during deliberations is considered to be trial error, such trial error can be quantitatively assessed in the context of other evidence and, therefore, is subject to harmless error analysis. State v. Zeigler , supra , citing State v. Johnson , 97-1519 (La. App. 4 Cir. 1/27/99), 726 So.2d 1126, writ denied , 99-0646 (La. 8/25/99), 747 So.2d 56.
The Louisiana Supreme Court in State v. Johnson , 94-1379 (La. 11/27/95), 664 So.2d 94, discussed the Louisiana harmless-error standard and stated that appellate courts should not reverse convictions for errors unless the accused's substantial rights have been violated. It noted that Louisiana has adopted harmless-error tests set forth by the United States Supreme Court in Chapman v. California , 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and Sullivan v. Louisiana , 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The inquiry in Chapman is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. Chapman v. California , supra. The inquiry in Sullivan is whether the guilty verdict rendered in this trial was surely unattributable to the error. Sullivan v. Louisiana , supra. The court must consider not what effect the constitutional error might generally be expected to have upon a reasonable jury, but, rather, what effect it had upon the guilty verdict in the case at hand. Id.
In the case sub judice , after jury deliberations began, the jury requested to review photographs of M.P. that were admitted into evidence. The trial court granted the request, and the bailiff delivered the photographs to the jury. When the bailiff returned, he stated that the jury also wanted to view Nurse Brumley's notes. Counsel for Spruell and Spann objected *408 to allowing the jury to view Nurse Brumley's notes, arguing that it was testimonial in nature. The trial court overruled the objections, and counsel for Spruell and Spann requested that the radiologist report that Nurse Brumley reviewed during her testimony also be sent to the jury. After the bailiff conferred with the jury, the trial court sent it the radiologist report, despite the state's objection.
Nurse Brumley's trial testimony regarding M.P.'s condition upon his arrival at West Carroll Memorial Hospital is substantially the same as the information contained in her notes. This evidence was written evidence and, pursuant to La. C. Cr. P. art. 793(A), should not have been reviewed by the jury during deliberation.
Although the trial court erred in allowing the jury to review Nurse Brumley's notes, this error was harmless in light of the considerable evidence regarding M.P.'s injuries. The photographs taken of M.P. by Nurse Brumley, which were properly provided to the jury during deliberation, showed his unresponsive state and the bruises covering his body on September 28, 2015. Similarly, CPS investigator Kristi Thomas photographed M.P. on September 29, 2015, and these photographs showed that he was unresponsive and on a ventilator and that there were scrapes and bruises on his body. Dr. Pena-Miches provided detailed testimony of M.P.'s injuries on September 29, 2015, including swelling to his brain ; bruising of different areas of his body, in different stages of healing; and petechiae on his neck, which indicated that his neck had been squeezed. Dr. Pena-Miches testified that these injuries could "[a]bsolutely not" have been caused by a fall of 13 inches from a bed onto the floor and opined that M.P. had been kicked or hit. He also found that the swelling of M.P.'s brain was not caused by infection, but, instead, by abusive trauma.
Considering the evidence presented at trial, the error of allowing the jury to review Nurse Brumley's notes did not contribute to the verdict obtained, and the guilty verdict rendered in this case is unattributable to the error. Therefore, it was harmless error.
Spruell did not object to the jury being provided with the radiologist report. In fact, defense counsel requested that this report be sent to the jury. Therefore, Spruell waived any argument as to the jury's review of the radiologist report during deliberation. See La. C. Cr. P. art. 841.
Accordingly, this assignment of error lacks merit.
Ineffective Assistance of Counsel and 404(B) Evidence
In her second assignment of error, Spruell argues that her trial counsel erred in failing to object to the joining of her and Spann in the same bill of information. She contends that by allowing them to be tried together in the same jury trial, she was most certainly prejudiced. In her third assignment of error, she argues that the trial court erred in allowing 404(B) evidence of Spann's Union Parish charges and protective order to be admitted into evidence at trial. She contends that this evidence, while introduced against Spann, unfairly prejudiced her in the minds of the jurors because it cast her in a negative light for allowing Spann to be around her son. Therefore, she argues that the introduction of this evidence is reversible error.
The state argues that claims of ineffective assistance of counsel are more appropriately raised in post-conviction relief proceedings. It contends that Spruell's trial counsel was not deficient and that she could not prove that she suffered any actual prejudice. It also argues that the trial court's admission of 404(B) evidence against Spann did not unfairly prejudice *409 her. It contends that the probative value of the Union Parish protective order outweighed any prejudice to her. In the alternative, the state argues that the admission of the other crimes evidence was harmless error.
As a general rule, a claim of ineffective assistance of counsel should be raised in an application for post-conviction relief in the trial court so that a full evidentiary hearing may be had under La. C. Cr. P. art. 930. State v. Williams , 33,581 (La. App. 2 Cir. 6/21/00), 764 So.2d 1164, citing State ex rel. Bailey v. City of W. Monroe , 418 So.2d 570 (La. 1982), and State v. Green , 27,652 (La. App. 2 Cir. 1/24/96), 666 So.2d 1302, writ denied , 97-0504 (La. 10/31/97), 703 So.2d 14. A motion for new trial is also a proper vehicle to raise such claims. State v. Williams , supra . When the record is sufficient, the claim may be resolved on direct appeal in the interest of judicial economy. State v. Ratcliff , 416 So.2d 528 (La. 1982) ; State v. Willars , 27,394 (La. App. 2 Cir. 9/27/95), 661 So.2d 673.
The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by U.S. Constitutional Amendment VI. State v. Wry , 591 So.2d 774 (La. App. 2 Cir. 1991). A claim of ineffective assistance of counsel is analyzed under the two-prong test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail, the defendant first must show that counsel's performance was deficient, i.e., that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Id. Second, the defendant must show that the deficient performance prejudiced his defense, i.e., that counsel's errors were so serious as to deprive the defendant of a fair trial and that but for counsel's unprofessional errors, the result of the proceeding would have been different. Id.
Regarding the joinder of defendants in an indictment or bill of information, La. C. Cr. P. art. 494 provides:
Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.
Regarding the trial of jointly indicted defendants, La. C. Cr. P. art. 704 provides:
Jointly indicted defendants shall be tried jointly unless:
(1) The state elects to try them separately; or
(2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.
Whether justice requires a severance must be determined by the facts of each case. State v. Turner , 365 So.2d 1352 (La. 1978) ; State v. Lynn , 52,125 (La. App. 2 Cir. 8/15/18), 251 So.3d 1262.
La. C.E. art. 404(B)(1) states:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance *410 of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. La. C.E. art. 403.[6]
A trial court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. State v. Bruce , 47,055 (La. App. 2 Cir. 5/25/12), 93 So.3d 717, citing State v. Scales , 93-2003 (La. 5/22/95), 655 So.2d 1326, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996). The erroneous introduction of other crimes evidence is subject to harmless-error review. State v. Bruce, supra , citing State v. Roberson , 40,809 (La. App. 2 Cir. 4/19/06), 929 So.2d 789.
Although ineffective assistance of counsel claims are more properly raised by an application for post-conviction relief, the record is sufficient to consider Spruell's allegations that her trial attorney was ineffective for failing to file a motion to sever. The record indicates that Spruell's trial counsel did not object to the state's amendment of the bill of information to join Spann. However, his failure to object cannot be construed as deficient performance.
Evidence of Spann's Union Parish charges and the corresponding protective order were admissible against Spann to show a system of crimes against M.P. The injuries caused by Spann in September 2014 are extremely similar to those suffered by M.P. in September 2015, namely, brain injuryand bruising from blunt force trauma. The probative value of this evidence, i.e., that Spann's prior act of violence against M.P. demonstrated that he was the same person to injure M.P. on September 27 or 28, 2015, outweighed any prejudicial effect. Evidence of Spann's prior abuse of M.P., his criminal charges and the protective order prohibiting him from contact with M.P. and M.P.'s family was prejudicial to Spruell, but this prejudice was outweighed by its probative value. This evidence demonstrated Spruell's knowledge of Spann's abuse of her son and, as such, her criminal negligence in allowing Spann to be in contact with M.P. As such, Spruell fails to prove that her trial counsel's failure to file a motion to sever prejudiced her case or that the trial court abused its discretion by allowing the state to adduce evidence of Spann's prior bad acts involving M.P.
Accordingly, these assignments of error lack merit.
Excessive Sentence
In her fourth assignment of error, Spruell argues that the trial court erred by sentencing her to 40 years at hard labor. She states that she was "not the one who abused the child in this case"; and, therefore, it was unfair that she received the same sentence as the "actual abuser," i.e., Spann. She argues that she is not one of the worst offenders and hers is not one of the worst offenses; and, therefore, her maximum sentence is excessive.
The state argues that Spruell's sentence is not excessive. It contends that the trial court thoroughly considered La. C. Cr. P. art. 894.1 and imposed a reasonable sentence within the statutory limits. It notes *411 that although Spruell contends that Spann was the abuser of M.P., the evidence adduced at trial did not rule out the possibility that Spruell physically abused her son.
When reviewing an excessive sentence claim, the appellate court uses a two-prong test. First, the record must demonstrate that the trial court complied with La. C. Cr. P. art. 894.1. The trial court is not required to list every aggravating and mitigating circumstance, but the record must reflect that it adequately considered the guidelines of La. C. Cr. P. art. 894.1. State v. Smith , 433 So.2d 688 (La. 1983). The trial court should consider the defendant's personal history and prior criminal record, the seriousness of the offense, the likelihood that the defendant will commit another crime and the defendant's potential for rehabilitation. State v. Jones , 398 So.2d 1049 (La. 1981). The trial judge is not limited to a consideration of the defendant's prior convictions but may properly review all of his prior criminal activity. State v. Russell , 40,526 (La. App. 2 Cir. 1/27/05), 920 So.2d 866, writ denied , 06-0478 (La. 9/29/06), 937 So.2d 851. The trial court is not required to assign any particular weight to any specific matters at sentencing. State v. Quiambao , 36,587 (La. App. 2 Cir. 12/11/02), 833 So.2d 1103, writ denied , 03-0477 (La. 5/16/03), 843 So.2d 1130.
Second, the appellate court must determine if the sentence is constitutionally excessive. A sentence is excessive and violates La. Const. art. I, § 20, if it is grossly out of proportion to the severity of the crime or is nothing more than the purposeless and needless imposition of pain and suffering. State v. Bonanno , 384 So.2d 355 (La. 1980). A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Id. A trial court has wide discretion in imposing a sentence within the statutory limits, and a sentence should not be set aside absent a showing of abuse of discretion. State v. Square , 433 So.2d 104 (La. 1983) ; State v. Black , 28,100 (La. App. 2 Cir. 2/28/96), 669 So.2d 667, writ denied , 96-0836 (La. 9/20/96), 679 So.2d 430. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. State v. Williams , 03-3514 (La. 12/13/04), 893 So.2d 7 ; State v. Free , 46,894 (La. App. 2 Cir. 1/25/12), 86 So.3d 29.
As a general rule, maximum or near maximum sentences are reserved for the worst offenders and the worst offenses. State v. Woods , 41,420 (La. App. 2 Cir. 11/1/06), 942 So.2d 658, writ denied , 06-2768 (La. 6/22/07), 959 So.2d 494, and writ denied , 06-2781 (La. 6/22/07), 959 So.2d 494.
Whoever commits the crime of second degree cruelty to juveniles shall be imprisoned at hard labor for not more than 40 years. La. R.S. 14:93.2.3(C).
At the sentencing hearing on February 21, 2018, the trial court noted its review of Spruell's presentence investigation report, which revealed details of two prior CPS investigations and a law enforcement investigation into injuries sustained by M.P. while in the sole care of Spann. It noted that Spruell lied to law enforcement and stated that she had not seen Spann in the year leading up to M.P.'s injuries, when, in fact, she and Spann had been living together during this time. It detailed the severe and permanent injuries suffered by M.P. on September 27 or 28, 2015, and stated:
[M.P.] is currently in foster-care. He will never be able to function on his own again. [M.P.] is blind in his right eye. Has no depth perception and very little use of his right side. [M.P.]'s neurological *412 [and] cognitive defects will require him to have twenty-four-hour care for the rest of his life. He can understand some of what people tell him but he cannot communicate. Unless a miracle happens in his life [M.P.] will require someone else to change his diaper and bath[e] him even when he is an adult. He has multiple doctors and therapists he is required to see on a regular basis.
The trial court discussed Spruell's family, educational and work history, as well as the fact that she had no criminal record. It considered letters submitted by Spruell's family and friends on her behalf. It noted its review of the sentencing factors provided in La. C. Cr. P. art. 894.1 and stated that Spruell was in need of correctional treatment, that there was an undue risk that she would reoffend if given a probated or suspended sentence and that a lesser sentence would deprecate the seriousness of her crime. It found that the aggravating factors included that Spruell's conduct during the commission of the offense manifested deliberate cruelty to the victim, that the victim of her crime was particularly vulnerable and incapable of resistance due to his extreme youth, that she used her position and status as the victim's caretaker to facilitate the commission of her crime and that the crime resulted in a significant and permanent injury to the victim. As mitigating factors, the trial court cited Spruell's young age and lack of prior criminal convictions.
The trial court then stated its reasons for sentencing:
While your age and your lack of any prior record weigh in your favor, [they] are overwhelmingly outweighed and completely negated when viewed in light of the fact that this crime was committed against your own child. A child of very tender age. A child that was absolutely defenseless against this crime. A child who was undeniably under your protection and control. And who was totally at your mercy. Despite this, [M.P.] suffered cruelly and viciously at the hands of you, his own mother. Because of your criminal act, your child suffered both serious bodily injury and permanent neurological impairment. Because of your criminal act [M.P.] will never be able to function on his own again. Because of your criminal act, he will be totally dependent on others for twenty-four-hour care for the rest of his life. Because of your crime, [M.P.] no longer has a choice in how his future years will be spent. Because of your crime, [M.P.], your own child, will never have a normal life. Will never develop physically or mentally to his normal potential and will always be relegated to the status of a basically helpless person.
The transcript of the sentencing hearing demonstrates the trial court's thorough consideration of the sentencing factors provided in La. C. Cr. P. art. 894.1. It noted Spruell's lack of a criminal record and her young age, but it concluded that those mitigating factors were outweighed by the aggravating factors of the case, namely, her relationship to the victim, the victim's very young age and vulnerability and the permanent injuries suffered by M.P. as a result of his mother's actions.
Spruell's sentence of 40 years at hard labor is not constitutionally excessive. The trial court's statements at the sentencing hearing indicate that its sentence was based on the permanent, life-altering injuries suffered by M.P. Considering M.P.'s injuries, the 40-year sentence is not grossly out of proportion to the severity of the crime and does not shock the sense of justice. Although a maximum sentence is generally reserved for the worst offenders and the worst offenses, the trial court's explanation of its sentence demonstrates *413 that Spruell is one of the worst offenders and the abuse suffered by M.P. is one of the worst offenses. Spruell allowed Spann continued access to her son after M.P. suffered injuries on two previous occasions while in Spann's sole care. Therefore, the trial court did not abuse its discretion in sentencing Spruell to the maximum sentence of 40 years at hard labor.
Accordingly, this assignment of error lacks merit.
DISCUSSION - SPANN
Insufficient Evidence
In his first assignment of error, Spann argues that the evidence adduced at trial is insufficient to support his conviction for second degree cruelty to juveniles because the state failed to prove that he committed any intentional or criminally negligent act that caused serious bodily injury to M.P. He contends that the state failed to prove that he was present at the time the alleged abuse occurred or that M.P.'s injuries were caused by his actions. He argues that the state's case relied solely upon circumstantial evidence and that it failed to exclude every reasonable hypothesis of innocence, including the possibility that M.P.'s injuries were caused by a fall, seizure, infectious disease or abuse by an unknown person.
The state argues that the evidence adduced at trial was more than sufficient to support the jury's verdict. It contends that the evidence shows that Spann was living in the same house as M.P. and was present when M.P. sustained his injuries. It argues that there was no evidence of any reasonable hypothesis of innocence.
The standard of review for a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Hearold , 603 So.2d 731 (La. 1992) ; State v. Smith , 47,983 (La. App. 2d Cir. 5/15/13), 116 So.3d 884. See also La. C. Cr. P. art. 821. This standard does not provide an appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder. State v. Pigford , 05-0477 (La. 2/22/06), 922 So.2d 517.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. State v. Allen , 36,180 (La. App. 2 Cir. 9/18/02), 828 So.2d 622, writs denied , 02-2595 (La. 3/28/03), 840 So.2d 566, and 02-2997 (La. 6/27/03), 847 So.2d 1255, and cert. denied , 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. Id. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Id. , citing State v. Sutton , 436 So.2d 471 (La. 1983), and State v. Owens , 30,903 (La. App. 2 Cir. 9/25/98), 719 So.2d 610, writ denied , 98-2723 (La. 2/5/99), 737 So.2d 747.
Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Broome , 49,004 (La. App. 2 Cir. 4/9/14), 136 So.3d 979, writ denied , 14-0990 (La. 1/16/15), 157 So.3d 1127, citing *414 State v. Moore , 44,429 (La. App. 2 Cir. 8/26/09), 20 So.3d 1137. If a case rests essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438 ; State v. Broome , supra .
The appellate court does not assess credibility or reweigh the evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam , 36,118 (La. App. 2 Cir. 8/30/02), 827 So.2d 508.
The crime of second degree cruelty to juveniles is defined by La. R.S. 14:93.2.3, which provides in pertinent part:
A.(1) Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.
(2) For purposes of this Section, "serious bodily injury" means bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or substantial risk of death.
Viewing the evidence in the light most favorable to the prosecution, a rational jury could have found that the state proved the essential elements of the crime of second degree cruelty to juveniles beyond a reasonable doubt. The parties stipulated to the facts that Spann and Spruell were both over the age of 17 and that M.P. was under the age of 17 at the time of the offense.
The expert testimony of Dr. Pena-Miches established that three-year-old M.P. suffered serious bodily injury and neurological impairment as a result of abusive trauma. He detailed the injuries to M.P. he observed, including swelling to his brain ; bruising of different areas of his body, in different stages of healing; and petechiae on his neck, which indicated that his neck had been squeezed. He testified that these injuries could "[a]bsolutely not" have been caused by a fall of 13 inches from a bed onto the floor and opined that M.P. had been kicked or hit. He also found that the swelling of M.P.'s brain was not caused by infection. He discussed M.P.'s continuing neurological impairment as evidenced by a CAT scan, an MRI scan and his interactions with M.P. He noted damage to M.P.'s brain in the area that affects vision, communication and behavior. He stated that areas of M.P.'s brain have atrophied; and, at the age of four, he had the brain of a 95-year-old. He determined that M.P. is "severely neurologically handicapped with no chances for independent life."
The testimonies of Nurse Brumley and Kristi Thomas of CPS also demonstrated that M.P. suffered serious bodily injury and neurological impairment as a result of physical abuse. Nurse Brumley noted bruising to M.P.'s right hip, upper right rib cage, back and chin; and she suspected that M.P. had been physically abused. Kristi Thomas viewed bruises on M.P.'s feet, back and legs. She testified that she had continued interaction with M.P. and observed that he had limited use of his right hand, had issues with depth perception, was unable to see out of his right eye and had limited communication skills.
The state presented evidence to establish that Spann's intentional or criminally negligent mistreatment or neglect caused M.P.'s injuries and neurological impairment. The state demonstrated that only Spann and Spruell had access to M.P. around the time of the offense. On July 29, 2015, Spann and Spruell signed the lease to 367 Barefoot Road and then lived there *415 with M.P., in violation of the Union Parish protective order. Det. Irby's testimony of the objects he viewed in the house, including Spann's birth certificate, the Union Parish protective order, the score sheet, Spann's utility bills, Spann's paychecks and the men's clothing and hygiene items further place Spann in the house in violation of the protective order.
The evidence presented at trial indicated that M.P. was injured at 367 Barefoot Road on the evening of September 27 or the morning of September 28, 2015, and also that Spann was present at that time. Spann's cell phone records place him near 367 Barefoot Road, rather than at his father's house, on the evening of September 27 or the morning of September 28, 2015. Grace Sanders, who lives down the street from 367 Barefoot Road, testified that on the morning of September 28, 2015, she saw Spann retrieving his dog from her yard.
Based on the evidence presented at trial, reasonable jurors could find that Spann was the individual responsible for M.P.'s injuries, thus rejecting every reasonable hypothesis of innocence, including that M.P.'s injuries were caused by an accident or illness or that they were inflicted by someone else.
Accordingly, this assignment of error is without merit.
Excessive Sentence
In his second assignment of error, Spann argues that his maximum sentence of 40 years at hard labor is unconstitutionally excessive. He contends that the trial court failed to give sufficient weight to certain factors, including his lack of a criminal history and his military service. He argues that because there was no evidence establishing that he caused M.P.'s injuries, there was also no evidence that he is one of the most egregious violators of the offense charged. Therefore, he contends that there is no justification for the imposition of the maximum sentence.
The state argues that Spann's sentence was not excessive. It notes the youth of the victim, the heinous nature of the crime and the permanent and debilitating injuries suffered by the victim and that Spann was charged in another parish with the same crime to the same child.
At the sentencing hearing on February 21, 2018, the trial court noted its review of Spann's presentence investigation report, which revealed the details of two prior CPS investigations and a law enforcement investigation into injuries sustained by M.P. while in the sole care of Spann. The first incident occurred on August 4, 2014, when two-year-old M.P. was taken to the emergency room with second degree burns over 20 percent of his body. Spann claimed that M.P. pulled a pot of boiling water off the stove. CPS's investigation into that incident was closed with an inconclusive finding. On September 7, 2014, M.P. was taken to the emergency room with bleeding on the brain, a lacerated liver, retinal hemorrhaging in his right eye and a subdural hematoma. The second incident led to the Union Parish charges and the protective order against Spann. The trial court noted the permanent injuries sustained by M.P. from Spann's abuse, including that his neurological injuries will require him to receive 24-hour care for the rest of his life. It discussed Spann's social history, including that he was an army veteran who was deployed twice to Iraq and was honorably discharged in 2012. Following his military service, Spann had a consistent employment history and no other criminal convictions aside from the current conviction. It also considered a statement written by Spann and letters submitted by his family and friends on his behalf.
*416 The trial court noted its review of the sentencing factors provided in La. C. Cr. P. art. 894.1 and stated that Spann was in need of correctional treatment, that there was an undue risk that he would reoffend if given a probated or suspended sentence and that a lesser sentence would deprecate the seriousness of his crime. It found that the aggravating factors included that his conduct during the commission of the offense manifested deliberate cruelty to the victim, that the victim of his crime was particularly vulnerable and incapable of resistance due to his extreme youth, that he used his position and status as the victim's caretaker to facilitate commission of his crime and that the crime resulted in a significant and permanent injury to his victim. As mitigating factors, the trial court cited Spann's young age and lack of prior criminal convictions. The trial court explained:
While your age and your lack of any prior criminal convictions weigh in your favor, they are greatly outweighed and almost totally eclipsed when viewed in light of the fact that this crime was committed against a child of very tender age. A child that was absolutely defenseless against this crime. And who was totally under the control of you and Brittany Spruell. Because of your criminal act, this child suffered both serious bodily injury and permanent neurological impairment. Because of your criminal act [M.P.] will never be able to function on his own again. Because of your criminal act, he will be totally dependent on others for twenty-four-hour care for the rest of his life. Because of your crime, [M.P.] no longer has a choice in how his future years will be spent.
The transcript of the sentencing hearing demonstrates the trial court's consideration of the applicable sentencing factors provided in La. C. Cr. P. art. 894.1 and the consideration of Spann's personal history. It emphasized the seriousness of the offense, focusing on the enduring injuries to a young, defenseless victim.
Spann's sentence of 40 years at hard labor is not constitutionally excessive. The trial court's statements at the sentencing hearing indicate that its sentence was based on the life-threatening and permanent injuries suffered by Spann's three-year-old victim. Considering M.P.'s injuries, the 40-year sentence is not grossly out of proportion to the severity of the crime and does not shock the sense of justice. Although a maximum sentence is generally reserved for the worst offenders and the worst offenses, the court's explanation of its sentence demonstrates that Spann is one of the worst offenders and his abuse of M.P. is one of the worst offenses. Therefore, it did not abuse its discretion in sentencing Spann to the maximum sentence of 40-years at hard labor.
Accordingly, this assignment of error lacks merit.
ERROR PATENT
After imposing the sentences, the trial court advised Spruell and Spann that they had "a period of two years from the date this sentence becomes final to assert any claim for post conviction relief." Its advisement was technically incorrect in that it stated that the time limitations for filing post-conviction relief commenced when the sentence, and not the conviction and sentence, become final. Therefore, this court advises Spruell and Spann that no application for post-conviction relief, including applications that seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C. Cr. P. art. 914 or 922. See La. C. Cr. P. art. 930.8.
*417 CONCLUSION
For the foregoing reasons, we affirm the conviction and sentence of Defendant Brittany Spruell. We also affirm the conviction and sentence of Defendant Corey R. Spann, Jr.
AFFIRMED.

This bill of information also charged Spruell with one count of violation of protective orders. On August 23, 2017, the state filed a motion to sever from the bill of information the charge of violation of protective orders and to place that charge in a separate bill of information. The trial court signed an order severing the charge.

At a hearing on August 28, 2017, the prosecutor moved to dissolve an order consolidating Spruell's and Spann's cases and, on the suggestion of counsel for Spann, moved to amend Spruell's bill of information to join Spann as a codefendant so that they could be tried together. The prosecutor noted that the matter had been discussed in chambers with opposing counsel and that it was "acceptable" to both counsel for Spruell and counsel for Spann. The trial court granted the motion.

Cheral Munn, an employee of Northeast Power, testified at trial and identified an account transfer document for 367 Barefoot Road, which noted the transfer of billing for that address to Spann on August 14, 2015.

Taylor Underwood, a radio access network design engineer and senior specialist with AT & T, identified detailed call records for accounts associated with cell phone numbers for Spruell and Spann. Underwood explained that the records included information about when calls were made and terminated and which cell phone tower was used. Each cell phone tower is described using latitudinal and longitudinal coordinates, and each tower generally has at least three sectors, which pick up cell phone signals coming from different directions.

On appeal, Spruell does not challenge the sufficiency of the evidence. The state asserts, therefore, that Spruell concedes that the evidence was sufficient to convict her. It is this court's obligation to ensure that the record is not devoid of evidence of an essential element of the charged offense. State v. Thacker , 14-0418 (La. 10/24/14), 150 So.3d 296. This court's review of the record confirms that the evidence presented at trial proves each essential element of the crime of second degree cruelty to juveniles as defined by La. R.S. 14:93.2.3.

We note that La. C.E. art. 412.4, which applies to evidence of similar crimes, wrongs or acts in cruelty against juveniles cases, was enacted after the commission of the crime in this case.